UNITED STATES of America,
Plaintiff-Appellee,

v.

Darryl Gordon HICKMAN and Fred
McArthur Head,
Defendants-Appellants.

Nos. 78–5148, 78–5149.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 17, 1978.

Decided Feb. 15, 1979.

As Amended March 27, 1979.

Edwin F. Kagin, Jr., Donald E. Armstrong, Jr., Louisville, Ky., for defendant-appellant in No. 78–5148.

W. Waverley Townes, Nold, Mosley, Clare, Hubbard & Rogers, Louisville, Ky. (Court-appointed), for defendant-appellant in No. 78–5149.

Albert Jones, U. S. Atty., James H. Barr, Asst. U. S. Atty., Louisville, Ky., for plaintiff-appellee.

Before WEICK, ENGEL and KEITH, Circuit Judges.

KEITH, Circuit Judge.

Appellants Darryl Gordon Hickman and Fred McArthur Head were jointly tried in the United States District Court for the Western District of Kentucky. Both defendants were found guilty of being convicted felons in possession of a sawed-off 12 gauge shotgun and of a 32 caliber revolver, in violation of 18 U.S.C.App., § 1202(a)(1).[1] In addition, appellant Head was found guilty of possession of marijuana for one's own use in violation of 21 U.S.C. § 844(a). The jury was unable to agree on charges against both men on possession of marijuana with intent to distribute. We are sufficiently troubled by the conduct of the district judge to reverse and remand for a new trial.

The facts are relatively straightforward. Acting pursuant to a search warrant; Louisville, Kentucky Police searched defendants' apartment and found *inter alia*, a shotgun, a pistol and approximately four pounds of marijuana.[2] Shortly thereafter, the two men were arrested as they were returning to the apartment. Appellant

Head's conviction of possession of marijuana stemmed from the discovery of a small amount of the drug which he allegedly dropped on the ground just before being arrested. This was a one day trial which presented the principal question of whether the two men were guilty of constructive possession of the weapons and drugs found in the apartment.[3] Simply stated this was a non-complex, routine case.

Although this case is routine, the conduct of the trial judge was not. Appellants charge that the district court's conduct of the trial rendered a fair verdict impossible. Appellant Head, in his brief, asserts that the district court voluntarily interjected itself in the proceedings over 250 times. Our examination of the entire record of the case bears out the truth of this allegation. Although this bare figure, by itself, is not dispositive, it serves to emphasize the serious problems we have concerning the way this trial was handled.

I

The law in this area is as easy to state as it is difficult to apply. The proper role of a federal trial judge was best summarized by the Supreme Court in the following oft-quoted words:

In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.

*Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933). Thus, the mere asking of questions is not at all improper:

1. The government concedes that the defendants should not have been convicted on separate counts for possession of the shotgun and possession of the pistol. *See United States v. Rosenbarger*, 536 F.2d 715 (6th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977).

2. Defendant Head contends that it was error for the prosecutor to introduce into evidence a letter which was seized at the apartment during the search. He maintains that the letter was illegally seized since it was not described in the search warrant. He further contends

that the letter could not have been seized under the plain view doctrine since it was not inherently incriminatory. We need not decide this issue, raised for the first time on appeal, in light of our disposition of this case. *See United States v. Truitt*, 521 F.2d 1174 (6th Cir. 1975); *United States v. Gray*, 484 F.2d 352 (6th Cir. 1973), *cert. denied*, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974). *See also United States v. Hare*, 589 F.2d 1291 (6th Cir. 1979).

3. Defendants' contentions that the evidence was insufficient to convict are meritless.

The trial judge in the federal court is more than a mere arbitrator to rule upon objections and to instruct the jury. It is his function to conduct the trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties. It is his duty to see that the issues are not obscured and that the testimony is not misunderstood. He has the right to interrogate witnesses for this purpose.

*United States v. Carabbia,* 381 F.2d 133, 139 (6th Cir. 1967), *citing Knapp v. Kinsey,* 232 F.2d 458, 466 (6th Cir.), *cert. denied,* 252 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956). *See Glasser v. United States,* 315 U.S. 60, 82–83, 62 S.Ct. 457, 86 L.Ed. 680 (1941).

However, great care must be taken by a judge to "always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury." *Frantz v. United States,* 62 F.2d 737, 739 (6th Cir. 1933). As good a summary as any of the applicable law was recently stated by Judge Pierce Lively in *United States v. Frazier,* 584 F.2d 790, 794 (6th Cir. 1978): "The basic requirement is one of impartiality in demeanor as well as in actions."

The problem is that potential prejudice lurks behind every intrusion into a trial made by a presiding judge. The reason for this is that a trial judge's position before a jury is "overpowering." *United States v. Hoker,* 483 F.2d 359, 368 (5th Cir. 1973). His position makes "his slightest action of great weight with the jury." *United States v. Lanham,* 416 F.2d 1140, 1144 (5th Cir. 1969), *citing Adler v. United States,* 182 F. 464 (5th Cir. 1919). *See Quercia v. United States, supra* at 470, 53 S.Ct. 525.

■ For this reason, this Circuit has disapproved of extensive questioning of witnesses by a trial judge. *United States v. Ball,* 428 F.2d 26, 30, (6th Cir. 1970) ("It is not 'desirable practice' for him to interrupt the proceedings by questioning the witnesses."); *United States v. Carabbia,* 381 F.2d 133, 139 (6th Cir. 1967), ("We do not look with favor on extensive examination of witnesses by the trial judge in a jury trial."); *United States v. Lewis,* 338 F.2d 137, 141 (6th Cir. 1964) ("[A] large number of questions asked by the trial judge is not to be commended as a desirable practice . . .").

As is apparent, determining when a trial judge oversteps is difficult. Numerous factors need be considered. First, the nature of the issues at trial. In a lengthy, complex trial, intervention by the judge is often needed to clarify what is going on. *See United States v. Smith,* 561 F.2d 8, 13–14 (6th Cir.), *cert. denied,* 434 U.S. 958, 98 S.Ct. 487, 54 L.Ed.2d 317 (1977); *United States v. Green,* 544 F.2d 138, 147 (3d Cir. 1976), *cert. denied,* 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977).

Second, the conduct of counsel. If the attorneys in a case are unprepared or obstreperous, judicial intervention is often called for. If the facts are becoming muddled and neither side is succeeding at attempts to clear them up, the judge performs an important duty by interposing clarificatory comments or questions. *See United States v. Frazier, supra* at 793; *United States v. Burch,* 471 F.2d 1314, 1317–18 (6th Cir. 1973).

Third, the conduct of witnesses. It is often impossible for counsel to deal with a difficult witness without judicial intervention. *See United States v. Burch, supra.* Similarly, a witness' testimony may be unbelievable and counsel may fail to adequately probe. *See United States v. Liddy,* 166 U.S.App.D.C. 95, 509 F.2d 428, 437–442 (1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975). More commonly, judicial intervention will operate to clear up inadvertent witness confusion. *See United States v. McColgin,* 535 F.2d 471, 474–75 (8th Cir. 1975), *cert. denied,* 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 128 (1976).

■ Assuming that a trial judge has good reason to interject himself into the trial, the manner in which he does so is crucial. Thus, an objective demeanor is important. Outright bias or belittling of counsel is ordinarily reversible error. *See*

*United States v. Dellinger,* 472 F.2d 340, 385–391 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). However, under some circumstances, misconduct by a trial judge may not mandate reversal. *See United States v. Weiss,* 491 F.2d 460, 467–68 (2d Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974) (many of judge's comments were out of the presence of the jury, were provoked by the conduct of counsel, and were directed against both sides).

■ More common is the appearance of partiality which can easily arise if the judge intervenes continually on the side of one of the parties. Our system of criminal jurisprudence hinges upon the advocacy role played by opposing counsel. Although a trial is a quest for the truth, and a federal trial judge is more than a neutral arbiter; interference with the presentations of counsel has the potential of making a mockery of a defendant's right to a fair trial, even in the absence of open hostility. *See United States v. Hoker, supra; United States v. Sheldon,* 544 F.2d 213, 216–19 (5th Cir. 1976); *United States v. Fernandez,* 480 F.2d 726, 737–38 (2d Cir. 1973); *United States v. Cassiagnol,* 420 F.2d 868, 879 (4th Cir.), *cert. denied,* 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970). Also present is the danger that undue interference with cross examination rights will result if a judge takes over examination by counsel. *See United States v. Cassiagnol, supra; Bursten v. United States,* 395 F.2d 976, 983 (5th Cir. 1968).

## II

The presence of the presiding judge permeates this trial. Our examination of the entire record of this case leads us to conclude that this judge was not impartial and that these convictions cannot stand.

We initially note that the district judge refused to permit either defense counsel to reserve making their opening statement to the jury until after the government had presented its case. Confronted with this refusal, one of the defense counsel attempted to make an on the spot opening statement immediately after the prosecutor finished. He was barely able to state that "I want to remind you just briefly of some of the principles of our system of law . . ." when he was immediately interrupted by the court: "Now, I won't let you do that. I won't let you argue it now. You can argue it later." This initial interruption was all too typical of other interruptions which took place throughout the trial.[4]

We stress that it is not so important whether the district court was correct in its determination that counsel's opening argument was improper, it is the number of times this happened, and the manner in which it was done, that creates serious doubt as to the fairness of this trial. The district judge rarely ruled on an objection by one side or another. Instead, he would *sua sponte* interrupt a witness or counsel, with the words "objection sustained" and then proceed to state why the witness' particular testimony was in some way objectionable. It apparently never occurred to the district judge to either wait for an objection, or to call counsel up before him out of the hearing of the jury and admonish them if they were misbehaving or bungling an examination of a witness.

The nature and scope of the district judge's questions present additional problems. The destructive effects of the judge's intrusions are apparent from his handling of the defense's cross-examination of expert witness John Stokes, the government chemist. The chemist testified that he per-

---

4. Further illustrative of the unfortunate tone which the district judge's interference set for the trial was the following brief colloquy:

Q. Where was the third suspect?
A. The third suspect?
Q. Yeah.
A. I did not personally see him. He was in a car at the time I first saw Mr. Head.

Q. And if I told you the third suspect was standing by the—
BY THE COURT: (Interrupting) Wait a minute, wait a minute. I'm not going to let you tell him anything,—
(Interrupting) Well,
BY THE COURT: (Continuing)—because you can't testify.

formed three different tests for marijuana upon the substance that he was given to analyze. After defense counsel elicited the admission that the first test, the microscopic test, was not conclusive for marijuana, the judge interrupted and stated "He says its not conclusive. That's why he made three tests." After defense counsel continued cross-examination as to the reliability of the second test performed by the chemist, the court interrupted once again:

BY THE COURT: Well, I'll save time. Have you got any chemist that's going to show that this is not marijuana?

MR. KAGIN: No.

BY THE COURT: You're just relying on your ability to satisfy the jury that this man doesn't know what he's talking about?

MR. KAGIN: That's right.

BY THE COURT: Proceed. You haven't tested it?

MR. KAGIN: No, Your Honor.

BY THE COURT: You haven't tested.

MR. KAGIN: I want to see if he has—

BY THE COURT: (Interrupting) Well, he says he has and there's no evidence to the contrary.

Counsel was then permitted to continue and amply cross-examine the witness further. Unfortunately, immediately after counsel had finished, the district judge stepped in at once and rehabilitated the witness' testimony. The entire sequence deserves reproduction:

Q. Is the thin layer chromatography test in and of itself conclusive for the presence of marijuana?

A. No, sir. It could have been hashish, it could have been Cannabin [sic], which is an active ingredient of marijuana.

Q. And it could have been something else that you've gotten here that's totally unrelated to marijuana and something that's not under control?

A. Well, if I hadn't done the microscopic test—

Q. (Interrupting) All right. Let's take that and say if you hadn't.

A. All right.

BY THE COURT: Well, now, you're arguing with the gentleman. You remember he's the one that made the tests. You're not going to testify yourself. I'm not going to let you.

Q. Are you telling me that this test is not of itself conclusive, is that correct?

A. That is correct.

Q. So we have Test No. 1 that is not conclusive, Test No. 2 that is not conclusive and Test No. 3 that's not conclusive. And from that you conclude its marijuana, is that correct, sir?

A. That's correct.

Q. No further questions.

BY THE COURT: Well, let's get this finished, and you can step down. Did you use the standard testing procedure that all United States chemists use in testing a substance to determine whether or not it is marijuana?

THE WITNESS: I used three, the three.

BY THE COURT: The standard ones that they use?

THE WITNESS: Well, some people use two of them, but I used these three.

BY THE COURT: I understand you used all three of them.

THE WITNESS: That's correct.

BY THE COURT: And in your professional opinion the substance in each of these three samples is in fact marijuana?

A. That's correct.

BY THE COURT: Step down.

The district judge's brilliant redirect examination would have been entirely proper had it been done by the prosecutor. It was improper for the judge to have assumed the prosecutor's role under the circumstances.

The judge's unfortunate handling of the testimony of witness Nathaniel Boyington further illustrates the need for reversal. Boyington was the younger brother of defendant Fred Head. He presented an improbable tale that the drugs and the weapons found in the apartment belonged to him not his brother. Mr. Boyington testified on direct examination for about 14 pages of

transcript. He was cross-examined for about 11 pages of transcript. After a brief colloquy at the bench, the court largely took over examination of the witness for an additional six pages of transcript. Not satisfied, the district judge then took over cross-examination entirely by himself for more than ten additional pages.

The trial judge's attitude toward the testimony of witness Boyington and other defense witnesses was best summed up by a remark made by the Court just before the swearing in of the final defense witness, James Beeler. The trial judge stated: "Is this witness in the same category?" The clear import of this statement was one of contemptuous disbelief. When combined with his earlier extensive examination of Boyington, the trial judge was clearly telling the jury, albeit indirectly, that he did not believe the defense story.

The district judge's demeanor is, of course, difficult to discern from the transcript. That his demeanor was anti-defendant is strongly inferable from our previous discussion, above. An additional indicator comes from an interruption of closing argument. During closing argument, the judge admonished defense counsel for improper argument in front of the jury by remarking ". . . I won't let you tell them rotten law." (R. 359)

On balance, this record fairly reveals constant interruptions which frustrated the defense at every turn and infringed upon defendants' rights of cross-examination. The only impression which could have been left in the mind of the jury was that the trial judge was a surrogate prosecutor.[5]

■ When one combines the limitation on cross-examination, the anti-defendant tone of the trial judge's interruptions, the wholesale taking over of cross-examination of defense witnesses by the trial judge; one is left with the strong impression that these two defendants did not receive the fair and impartial trial which the Sixth Amendment to the Constitution guarantees them. We are convinced that judged as a whole, the conduct of the trial judge must have left the jury with a strong impression of the judge's belief of the defendant's probable guilt such that it was unable to freely perform its function of independent fact finder.

Our conclusion is reinforced because the judge's actions were so unnecessary. This was a one-day trial. The principal issue for the jury was whether it would impute possession of the contraband in the apartment to one or another defendant. Counsel for both sides were able and, at all times, conducted themselves properly. The testimony was relatively clear and any difficulties could easily have been handled by counsel had the judge restrained himself. There was no need for judicial intervention to assist the jury by clarifying the facts.

■ Given what occurred here we are persuaded that the district court's instructions to the jury could not offset the effects of his conduct. Nor do we hold the failure to object against defense counsel. We think that the following statement of the Seventh Circuit in *United States v. Hill*, 332 F.2d 105, 106–07 (7th Cir. 1964) is fully applicable here:

> Counsel for defendant in a criminal case, is indeed in a difficult and hazardous predicament in finding it necessary to make frequent objections in the presence of a jury to questions propounded by the trial judge. The jury is almost certain to get the idea that the judge is on the side of the Government.

In any event, we are convinced that the trial court's conduct amounted to plain error.[6]

Reversed and remanded for a new trial.

---

**5.** It is illuminative to contrast the conduct which occurred here with that in *United States v. Frazier*, 584 F.2d 790 (6th Cir. 1978). In that case there was no belittlement of counsel or display of hostility before the jury. The trial judge did not examine any of the witnesses and interrupted examination by counsel only on several occasions.

**6.** The district judge in this case was a visiting judge from another district not within this circuit.