Thomas LEWIS, Petitioner–Appellant,

v.

Kenneth J. ROBINSON, Warden, Respondent–Appellee.

No. 01–2161.

United States Court of Appeals, Sixth Circuit.

June 20, 2003.

BEFORE: MARTIN, Chief Circuit Judge; KRUPANSKY and COLE, Circuit Judges.

## OPINION

COLE, Circuit Judge.

Petitioner Thomas Lewis filed *pro se* a petition for writ of habeas corpus, challenging his Michigan state convictions because, *inter alia*, he was denied his constitutional rights when: (1) he was not permitted to represent himself, (2) he was shackled and gagged during trial, and (3) the judge made comments in front of the jury evidencing bias against him. For the reasons described below, we AFFIRM the district court's denial of the writ.

## I. BACKGROUND

Petitioner was tried before a jury in September 1990 on charges of armed robbery, felony firearm possession, and assault with a dangerous weapon, arising out of a June 23, 1990 robbery of a Burger King in Flint, Michigan. On the day of jury selection, at Petitioner's request, Petitioner's counsel moved to dismiss himself as counsel, and noted Petitioner's objection to the proceedings. The trial court responded: "Well, that is denied out of hand. The day of trial playing that kind of game is one this Court is not going to play."

After the jury was selected and excused for a recess, counsel for Petitioner renewed the motion, stating against that Petitioner objected to the proceedings. The trial court responded that Petitioner has:

[S]hown today that he's not capable of trying the case. by himself. It's been apparent from all the games that he's played with the Court. And, I am not going to let you out of the case and I'm not going to let him try the case. So I expect you to try the case. His motions are denied.

After taking a recess, but out of the presence of the jury, the trial court reluctantly agreed to permit Petitioner's counsel to read a statement into the record. This statement objected to the proceedings, explaining that counsel was not prepared to try the case, Petitioner had not been permitted adequate time to prepare a defense, and that the trial court had threatened Petitioner with being bound and gagged. The statement also read: "I renew the motion for adjournment until a defense can be prepared; that visitation be restored so I can prepare a defense; that I be allowed to represent myself." In response, referring to prior testimony that Petitioner was manipulative, the trial court stated that:

[I]t's quite clear that he's playing the game because he figures that he has only one way to beat this, and this is to try to create error. And, I am not going to let him represent himself because of his manipulative behavior. He shows

that he does not have the ability to act decently in court and he wants to play all kinds of games. And, I deny the motion.

Petitioner's counsel then requested that Petitioner be permitted to address the court. The trial court initially refused, but then addressed Petitioner directly:

Court: What do you want to say, dummy?

Defendant: Why do I have to be a dummy, your Honor?

Court: Because of the way you're acting. . . .

A lengthy colloquy ensued between Petitioner and the trial court. As Petitioner attempted to explain his conduct, the trial court accused Petitioner of attempting to manipulate the court and others. The trial court repeatedly told Petitioner that he was "playing games," calling Petitioner's explanations a "sham," and calling Petitioner a "shill." Ultimately, the trial court stated:

—you're trying to play the manipulative game here. I don't know how many people you think you can con on this. Why don't you just shut up and let Mr. Hayman, who is one of the finest trial attorneys in Genesee County, try the case and you quit interfering with it.

When Petitioner explained that he was being sincere, the trial court responded:

Ho, ho, ho, that's a laugh. At least I get some fun out of this because he's such a—he thinks that he can con everybody. . . . We've had it. We're going to trial and I'm not going to listen to any more of your trivial motions that you are trying to force on Mr. Hayman. Mr. Hayman's a good attorney and you are putting him in a terrible spot, because he's a competent fellow and you're not able to act decently in a courtroom. So quit trying to put all these motions be-

fore the Court. . . . All right, bring the jury in, that's it. And if you lip off once more, I'm gonna have your mouth taped because that's the only way you can deal with this.

During a later recess, Petitioner's counsel informed the trial court that Petitioner had again indicated that he did not want to be represented by counsel at trial and did not want counsel to make an opening statement or to question any witnesses. The trial court refused to hear Petitioner speak on the issue of his representation, explaining that counsel is "very competent" and "very diligent." When counsel persisted that Petitioner did not want counsel to present a "sham defense," the trial court stated:

Well, since he had—he was arraigned in this case on July 18, 1990, and he's had plenty of time, and he wants to play these little games with the Court including, as I've already noted, the manipulative behavior that is a part of his whole personality. And, he's antisocial, which means that he cannot understand the rules of society, therefore that's why he raises these questions. I deny 'em all.

Later, during trial and in the presence of the jury, Petitioner struck his attorney, drawing blood, yelling, "You get the fuck away from me, mother fucker. . . . This is a mock trial and you won't even . . . let me present a fuckin' defense . . . or nuthin'." The trial court interjected and ordered that the courtroom deputies tape Petitioner's mouth. As the deputies struggled to tape Petitioner's mouth, he continued to spew obscenities at his counsel and at the judge, claiming that he had been prohibited from presenting a defense. The deputies placed Petitioner in handcuffs and leg irons, and taped his mouth. The trial court then instructed the jury: "The jury is to ignore this outburst by the defendant.

He is attempting to create a mistrial, so ignore what he's trying to do."

The witness's testimony resumed. When the witness identified Petitioner, Petitioner began to make noises through the tape on his mouth. Petitioner claims that he was attempting to communicate with counsel. At this point, Petitioner was removed from the courtroom altogether.

At the conclusion of this witness's testimony and after the jury had been excused, the trial court stated that it would be preferable for Petitioner to be able to hear the proceedings, querying whether that would possible if Petitioner was not in the courtroom. In response, Petitioner's counsel and the Government agreed that it would be preferable for Petitioner to be present in the courtroom, if possible. The judge decided to bring Petitioner back into the courtroom, but to keep his legs shackled, his hands cuffed, and his mouth taped. On behalf of Petitioner, counsel then renewed Petitioner's request to dismiss counsel. The trial court again rejected this request, stating that Petitioner is "antisocial" and acting like a "spoiled brat."

The trial was conducted without further incident. The jury convicted Petitioner of the three charges against him. On September 27, 1990, Petitioner was convicted as a "fourth habitual offender," and his armed robbery conviction was vacated. Petitioner was sentenced to serve thirty-four to sixty years on the habitual offender charge, ten to fifteen years on the assault with a dangerous weapon charge, and two years on the firearm charge.

The Michigan Court of Appeals affirmed Petitioner's conviction without explicitly addressing any of the issues presented in this appeal, stating, "we have reviewed the issues presented by defendant in his pro se brief and find them to be without merit." The Michigan Supreme Court denied leave to appeal. Petitioner was denied state collateral relief.

On August 13, 1998, Petitioner filed his § 2254 petition (the "Petition"). On July 27, 2001, the district court denied the Petition, finding that: Petitioner's judicial bias claim was not meritorious because Petitioner had not shown unfair treatment as a result of actual bias; Petitioner's request to represent himself was a "ruse for delay" rather than a good faith assertion of Petitioner's limited right to represent himself; and the trial court was justified in shackling and gagging Petitioner given his "extreme and aggravated" disruptive behavior, which included striking his own attorney.

## II. ANALYSIS

This Court reviews a district court's decision to grant or deny habeas corpus relief *de novo*. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir.1999). We review the district court's findings of fact for clear error. *Id.*; *Carson v. Burke*, 178 F.3d 434, 436 (6th Cir.1999).

Our review is governed by the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 323, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). In AEDPA, 28 U.S.C. § 2254(d)(1), Congress provided that a writ of habeas corpus shall only be granted upon a showing that adjudication of a claim on the merits in State court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States...."

The Supreme Court has explained that a state court decision is "contrary to" the Supreme Court's precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court

confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the result reached by the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see Lewis v. Wilkinson*, 307 F.3d 413, 418 (6th Cir.2002). A state court decision may be an "unreasonable application" of clearly established Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407; *see Lewis*, 307 F.3d at 418.

## A. Self–Representation

█ Petitioner claims that he was denied his constitutional right to represent himself. Petitioner challenges the district court's factual findings, arguing that the district court's findings that the state trial court denied Petitioner's motion to represent himself because Petitioner sought to "delay" trial and did not seek self-representation "in good faith" were clearly erroneous.

A criminal defendant has a constitutional right to proceed without counsel where he voluntarily and intelligently elects to do so. *Faretta v. California*, 422 U.S. 806, 820–21, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Before such an election may be made, a defendant must be informed of the dangers of self-representation. *See Mar-*

*tinez v. Court of Appeal of Cal.*, 528 U.S. 152, 162, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000); *Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir.2001). In *Faretta*, the Supreme Court found voluntary and intelligent waiver because "weeks before trial, [the defendant] clearly and unequivocally declared to the trial court that he wanted to represent himself and did not want counsel. The record affirmatively show[ed] that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." *Coleman*, 268 F.3d at 448. Further, the defendant in *Faretta* had "a genuine inclination to conduct his own defense, and demonstrated an ability to do so." *Robards v. Rees*, 789 F.2d 379, 383 (6th Cir.1986).

Petitioner first requested to represent himself before jury selection on the day trial was to begin. Although a self-representation request is typically timely if made prior to the selection and swearing of the jury, this Court has held that such a request it not timely "when the prosecution makes an affirmative showing that the defendant's request for self-representation is merely a tactic to secure a delay in the proceeding." *Robards*, 789 F.2d at 383. Here, Petitioner had not previously expressed any "expressed any displeasure with the quality of his attorney's efforts," *id.* at 383–84, and Petitioner's attorney was competent. Moreover, Petitioner did not exhibit a "genuine inclination to conduct his own defense."[1] Instead, Petitioner disrupted the proceedings and displayed erratic behavior. As the trial court concluded, and the record supports. Petitioner was "not able to act decently in a courtroom." Finally, despite Petitioner's

---

1. The trial court rejected Petitioner's request out of hand, making no inquiry into whether Petitioner's request was made knowingly or voluntarily. Thus, there is little in the record

from which this Court must discern whether Petitioner's request satisfied *Faretta*. *See Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir.2001).

argument to the contrary, permitting self-representation would have required a delay to permit Petitioner to prepare for trial. *See id.* Thus, the conclusion that Petitioner did not assert his *Faretta* right genuinely and in good faith, but rather, as a last-ditch effort to delay the proceedings, does not appear to be clearly erroneous and Petitioner cannot obtain relief on this claim.

## B. Use of Shackles and Removal From the Courtroom During Trial

■ Petitioner argues that the trial court violated his Sixth and Fourteenth Amendment rights when it shackled and gagged him in the presence of the jury and later removed him temporarily from the courtroom altogether. Petitioner argues that the shackling and gagging prejudiced the jury, denying him the presumption of innocence. Further, he claims that these physical restraints infringed his right to communicate with counsel. Petitioner also claims that his removal from the courtroom violated his rights to be present at his own trial, and to cross-examine and confront witnesses.

One of the "most basic" of the rights guaranteed by the Confrontation Clause of the Sixth Amendment and the guarantees of the Fourteenth Amendment is "the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). However, an accused cannot claim the benefit of this right while engaging in "speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial." *Id.* The Supreme Court has explained:

> A defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

*Id.* at 343. The Supreme Court concluded that a flexible policy, affording broad discretion to the trial judge to maintain courtroom decorum, is necessary to secure this right. *Id.* Finding that "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations," the Supreme Court concluded that where a defendant is "obstreperous," the constitution permits a trial judge to bind and gag a defendant in order to keep him present, to cite the defendant for contempt, or to take him out of the courtroom until he promises to conduct himself properly. *Id.* at 343–44; *see Kennedy v. Cardwell,* 487 F.2d 101, 107 (6th Cir.1973) ("The decision to shackle a defendant rests in the first instance in the discretion of the trial judge and the test on review is whether the trial judge has abused this discretion."). The instant case involves decisions to use shackles and to remove Petitioner from the courtroom.

First, Petitioner argues that his constitutional rights were violated because he was shackled and gagged not as a last resort but, rather, as a first resort. Shackling and gagging during trial should be used only as a last resort because of the "inherent disadvantages" associated with such restraints, namely, the potential to impact the jury's feelings about the defendant, that these restraints are themselves an affront to the decorum of the judicial

proceedings, and because the use of these restraints greatly reduces the defendant's ability to communicate with counsel. *Allen*, 397 U.S. at 344; *see Kennedy*, 487 F.2d at 108. Each of these disadvantages was considered by the *Allen* Court, which stated that "binding and gagging might possibly be the fairest and most reasonable way to handle a defendant who acts as [the defendant] did here." 397 U.S. at 344.[2] This Court addressed the use of shackling directly, explaining that "shackles should never be permitted except to prevent the escape of the accused, to protect everyone in the courtroom, and to maintain order during trial." *Kennedy*, 487 F.2d at 105 (involving a defendant who was shackled for security reasons as he presented a threat of violence and escape).

This Court has "recognized that the physical indicia of innocence are so essential to a fair trial that the better practice is to hold a hearing so that factual disputes may be resolved and evidence of the facts surrounding the decision are made a part of the record." *Id.* at 107. Here, no evidentiary hearing was ordered by the trial court nor requested by Petitioner. Nevertheless, it is clear that shackling was not used as a first resort in this case. Petitioner was not shackled at the commencement of trial. In fact, despite the fact that Petitioner repeatedly disrupted the court proceedings, he was not gagged until he assaulted his attorney in front of the jury. Prior to the use of physical restraints, Petitioner's disruptive behavior had prompted the trial court to warn Petitioner that his mouth would be bound if he

continued to disrupt the proceedings. Given Petitioner's extreme and violent conduct, there was likely no less restrictive means of effectively and immediately controlling Petitioner's behavior than to restrain him physically. Additional warnings would have been fruitless. Likewise, the threat or imposition of contempt sanctions would probably not have deterred Petitioner. Petitioner's extreme disruptiveness and violence justified his being shackled and gagged in order to permit Petitioner to remain present in the courtroom during his trial without posing a threat of physical harm to others or interrupting the proceedings. Given the significant deference we owe to the trial court's decision, the trial court's decision to shackle and gag Petitioner was not an abuse of discretion, much less "contrary to" or an "unreasonable application of" clearly established Supreme Court precedent.

■ Next, Petitioner argues that his constitutional rights were also violated when he was removed from the courtroom. The Supreme Court has held that there is "nothing unconstitutional" about removing a defendant from the courtroom where his behavior was of "such an extreme and aggravated nature as to justify either his removal from the courtroom or his total physical restraint." *Allen*, 397 U.S. at 345–46. The *Allen* Court relied on the facts that the defendant had repeatedly been warned that his misconduct would result in removal and that he would be permitted to return to the courtroom if he

---

**2.** In conducting his own defense, the defendant in *Allen* argued with the judge in a "most abusive and disrespectful manner," talked throughout the proceedings, threatened the judge, and tore up papers in front of the jury. *Id.* at 339–40. The trial judge warned the defendant that he would be removed from the courtroom if he did not behave. *Id.* at 340. After the defendant continued to be

disruptive, the trial judge made good on his warnings. *Id.* The defendant was permitted to return when he promised to behave, but was removed again when he misbehaved. *Id.* at 341. The defendant returned only to be identified by government witnesses during the prosecution's case, but was present in the courtroom for the presentation of the defense case. *Id.*

agreed to "conduct himself in an orderly manner." *Id.* at 346.

Petitioner was removed from the courtroom only after he: (1) had been warned to behave appropriately and not to disrupt the proceedings, (2) struck his counsel, (3) was shackled and gagged, (4) continued to talk to counsel and the witness through the gag, disrupting the trial and making it difficult to understand the witness's testimony. Petitioner was only outside the courtroom for the conclusion of one witness's testimony. Moreover, Petitioner was permitted to confer with counsel when he returned to the courtroom. There is nothing in the record to suggest that the trial court had the technological wherewithal to permit him to hear the proceedings remotely. Thus, as in *Allen,* after Petitioner had been warned that his behavior was inappropriate, his continued extreme misconduct and disruptive behavior justified either physical restraint or removal. In compliance with *Allen,* Petitioner was permitted to return to the courtroom at the request of his counsel upon agreement to conduct himself properly. *Id.* at 341, 343. Accordingly, the trial court's action in removing Petitioner cannot be said to have been an abuse of discretion, much less "contrary to" or an "unreasonable application of" clearly established Supreme Court precedent.

## C. Judicial Bias

Petitioner argues that the trial judge was hostile toward him and that this prejudiced him at trial. As support for his judicial bias claim, Petitioner points to the trial court's denial of his motion for a forensic examination and the denial out of hand of his motions to represent himself; directing derogatory statements at Petitioner; and instructing the jury that Petitioner had deleterious motives.

The Fourteenth Amendment requires that a defendant be afforded a "fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley,* 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (citation omitted); *see In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."). This Court has explained that "[i]f a habeas court determines that bias by a state judge resulted in a constitutional violation, then the court is required to overturn the state court decision." *Alley v. Bell,* 307 F.3d 380, 386 (6th Cir.2002).

Further, this Court looks to "the Supreme Court's decision in [*Liteky* ] to provide the standard for deciding judicial bias claims; in that case, the Court explained that 'the pejorative connotation of the terms 'bias' and 'prejudice' demands that they only be applied to judicial predispositions that go beyond what is normal and acceptable.' " *Id.* (quoting *United States v. Liteky,* 510 U.S. 540, 552, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)); *see Burton v. Jones,* 321 F.3d 569, 577 (6th Cir.2003) (quoting *Liteky,* 510 U.S. at 551) (stating, in a cursory discussion of a judicial bias issue, that to succeed on a judicial bias claim there must be evidence that the judge has "a 'predisposition so extreme as to display clear inability to render fair judgment' "). Generally a showing of actual bias is required, but this Court also concerns itself with the appearance of judicial bias. *Anderson v. Sheppard,* 856 F.2d 741 (6th Cir.1988) ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."); *see also United States v. Lowe,* 106 F.3d 1498, 1504 (6th Cir.1997) ("To state a due process claim that a judge was biased, [a] defendant

must show either that actual bias existed, or that an appearance of bias created a conclusive presumption of actual bias.").

■ First, Petitioner claims that the trial judge's bias and hostility toward Petitioner caused it to deny Petitioner's motions for a forensic evaluation and to represent himself. Petitioner claims that the trial court repeatedly denied his motions without deliberation or consideration, and would not permit him to argue the merits of the motions to the court. On the day of trial, Petitioner requested a forensic evaluation of his competency to stand trial. The trial court ordered medical records from the jail where Petitioner was detained and determined from these records that Petitioner was manipulative, but not suffering from any mental deficiency that would preclude trial. The trial court denied the motion, concluding that Petitioner was seeking to manipulate the proceedings and avoid going to trial. Later, when Petitioner sought to represent himself, the trial court denied that motion. finding, based in part on the medical evidence but also on Petitioner's behavior and the timing of the motion, that Petitioner was again seeking to delay the proceedings.

The Supreme Court has explained that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . . Almost invariably, they are proper grounds for appeal, not for recusal." *Liteky*, 510 U.S. at 555 (addressing 28 U.S.C. § 455, the judicial recusal statute). Here, the trial court's rulings were not so outrageous as to demonstrate bias. Rather, the trial judge was within his discretion in denying Petitioner's motions. The trial court considered the relevant evidence before it, and, although the trial court could have considered these motions more thoroughly, it was not improper to

deny them on the grounds stated under the circumstances.[3]

■ Second, Petitioner complains that the trial court directed many derogatory statements toward Petitioner. In particular, Petitioner focuses on the trial court's statements that it would not believe Petitioner, and the trial court's repeated name calling, including calling Petitioner a "three or four time loser," a "dummy," "spoiled brat," "sham," "shill," and a "sociopath." This name calling was often in response to the Petitioner's attempts to address the trial court and to what the trial court perceived as his attempts to delay the trial. The Supreme Court explained that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus judicial remarks during the course of the trial that are critical or disapproving of or even hostile to counsel the parties or their cases, ordinarily do not support a bias or partiality challenge." *Id.* (explaining that expressions of impatience, dissatisfaction, annoyance, and even anger are permissible, although not preferable). Although the statements by the trial judge in this case clearly expressed impatience, dissatisfaction, annoyance, and also anger, and were unnecessary and perhaps uncalled for, these statements did not make fair judgment impossible.

Most of these statements were made outside of the presence of the jury. However, this Court has previously explained "that a trial judge can communicate hostility and bias to a jury in ways that are not ascertainable from a reading of a 'cold'

---

3. When viewed in conjunction with the incessant name calling and the statement to the jury, this conduct still does not rise to the level of judicial bias.

written record of the proceedings." *Anderson*, 856 F.2d at 746. This suggests that where hostility and bias are clearly exhibited prior to trial, but not during a trial, we cannot presume the pre-trial bias created only harmless error. *Id.* (addressing dissent's argument that only harmless error occurred). Here, however, the pre-trial statements and actions of the trial court suggest exasperation or annoyance, but do not evidence actual hostility or bias. Thus, unlike *Anderson*, there is no actual hostility or bias–either before, or during, trial–upon which to base a claim which could have affected the fairness of Petitioner's trial.

■ Finally, Petitioner argues that the trial judge made a statement before the jury that prejudiced him. Namely, after Petitioner struck defense counsel, the trial court stated that the jury should ignore Petitioner's "outburst." Specifically, the trial court instructed the jury that "[h]e is attempting to create a mistrial, so ignore what he's trying to do." Given the extreme circumstances prompting this statement, the trial court was justified in instructing the jury to disregard Petitioner's conduct. Although the trial court should have taken greater care "to always be calmly judicial dispassionate and impartial' ... [in order to] 'preserve[ ] *both* the *appearance* and *reality* of fairness.' " it does not appear that any actions by the trial court deprived Petitioner of a fair trial. *Id.* at 745–46.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.